113     37
a212s 429

# The Indiana, Illinois & Iowa Railroad Company v. Harry Otstot.

## Gen. No. 4,289.

1.  OPINION OF APPELLATE COURT—*how far, binding.*   The opinion of the Appellate Court rendered in a cause is binding both upon it and the trial court in a subsequent trial and appeal of the same cause.

2.  ORDINARY CARE—*what may be considered in determining whether plaintiff has exercised.*   In determining whether the plaintiff was in the exercise of ordinary care at the time of his injury, the surrounding circumstances and the natural instinct of self-preservation may be considered.

3.  SERVANT—*duty of master to protect.*   A servant of a railroad company though performing menial labor, like that of a section hand,

whether in railroad yards or on a private right of way, is entitled to all the rights afforded to the public by ordinance, statute or general custom of the company.

4. ASSUMED RISK—*what is not.* The mere fact that a servant injured while in the employ of a railroad company by reason of an engine which had approached without warning, testifies that he had frequently seen engines moving about at the place of his injury in like manner, does not render the risk assumed.

5. FELLOW-SERVANTS—*who are not, as a matter of law.* A section hand working on the tracks of a railroad company under one foreman, is not, as a matter of law, a fellow-servant with a hostler employed by such company in another department and under another foreman, where there is nothing in the evidence to show that they ever came into contact with each other or had anything to do with each other in their respective lines of employment other than that they generally worked in the same territory.

6. FELLOW-SERVANTS—*doctrine of.* Servants of the same master are fellow-servants if at the time of the injury they are directly cooperating with each other in the particular business in hand, or if they are brought by their usual duties into habitual consociation, so that they may exercise an influence upon each other promotive of proper caution.

7. GENERAL OBJECTION—*when, not sufficient.* A general objection is unavailing for the purpose of urging the erroneous admission of evidence tending to prove a custom subsequent to the accident in question.

8. INSTRUCTIONS—*when, properly refused.* Instructions are properly refused which do not state correct propositions of law applicable to the facts of the case and which invade the province of the jury by telling it what the evidence proved or by telling it that certain kinds of evidence were of more value and entitled to greater weight than other kinds.

9. REMARKS OF COUNSEL—*when, not prejudicial.* Remarks as follows : " We have no instructions to pass up, Your Honor," and " We have a right to tell the jury that we are not going to ask any instructions," held not prejudicial.

10. VERDICT—*when, not excessive.* A verdict for $8,000 rendered in favor of a plaintiff who was at the time of his injury sixty years of age, earning from $1.10 to $1.25 per day, and whose injury consisted in the loss of a leg, the breaking of a shoulder bone and in the weakening and diminishing of the size of his arm, is not excessive.

11. VERDICT—*when, not excessive.* A verdict is not excessive merely because its amount when invested at five per cent interest will produce a larger annual income than that which the plaintiff was capable of earning prior to his injury.

Action on the case for personal injuries. Appeal from the Circuit Court of La Salle County; the Hon. CHARLES BLANCHARD, Judge, presiding. Heard in this court at the October term, 1903. Affirmed. Opinion filed March 14, 1904.

CARY & WALKER and REEVES & BOYS, for appellant.

ARTHUR H. SHAY, BROWNE & WILEY, and BREWER & STRAWN, for appellee.

MR. JUSTICE FARMER delivered the opinion of the court.

This case was before us at the April term, 1902, and in an opinion filed in July of that year we reversed the judgment of the Circuit Court, and remanded the case, because the trial court, at the conclusion of plaintiff's evidence, directed a verdict for the defendant. Otstot v. I., I. & I. R. R. Co., 103 Ill. App. 136. The second trial of the case resulted in a verdict and judgment for plaintiff, for $8,000, and defendant appeals. The evidence for plaintiff at the second trial was substantially the same as at the first. Defendant moved the court to direct a verdict in its favor at the conclusion of plaintiff's evidence and also at the conclusion of all the evidence in the case, which motions were overruled and exceptions taken.

The only substantial difference between this record and the one presented at a former term of this court, is that on the second trial, defendant introduced its testimony and the case was submitted to the jury. The principal grounds urged by defendant's counsel for a reversal of this judgment, are that no negligence of defendant was proven; that the evidence shows plaintiff was not exercising due care at the time of the injury and was guilty of such contributory negligence as to bar a recovery; that if Mumaw, the man in charge of the engine that injured plaintiff, was negligent, still plaintiff could not recover, because he and the engineer were fellow-servants, and that the injury was the result of an assumed risk of plaintiff's employment. For these reasons it is claimed the court erred in not directing a verdict for the defendant. All these questions were discussed in the former opinion of this court, and we there held that the controverted question as to whether defendant was negligent, whether plaintiff was guilty of contributory negligence, whether the accident was the result of an assumed risk, and whether the hostler in charge of the en-

gine was a fellow-servant with plaintiff, were the questions of fact for determination by the jury. We held the facts as disclosed by plaintiff's testimony made such a case as that the court was not authorized to determine the controverted questions of negligence, fellow-servants, and assumed risk, as matters of law, but that they should have been submitted to the jury. The decision was binding upon the trial court at the second trial upon these questions, and is binding upon us now. Wilson v. Carlinville National Bank, 87 App. 364; Murphy v. Murphy, 93 Ill. App. 671; Walker v. Freeman, 94 Ill. App. 357. Even if this were not so, we are of opinion the same conclusions must be reached. If we are correct in this position, then the most important question for our determination at this time is, whether the verdict is sustained by the evidence, and whether the court erred in overruling defendant's motion for a new trial.

Plaintiff was in defendant's employment as a section hand. He and the witnesses, Mull and Lantzer, were working together under Harry Sawyer as foreman, at the time the injury occurred. The territory in which plaintiff and those associated with him usually worked, embraced the tracks in that portion of defendant's yard where plaintiff was injured. On the morning of February 7, 1900, a little after seven o'clock, plaintiff and those working with him started from a point a little more than two blocks north of where the accident occurred, south on a hand-car. They proceeded as far as Lundy street when they were stopped by a switch engine that was using the tracks in switching cars south of them and in the direction they were going. While waiting for the switch engine to get out of their way, Mr. Sawyer, the foreman, directed his men to take the car off the track and clean out the water that had accumulated under the switch points, from Lundy street north. Between Lundy street and Livingston, the next street north of it, there were the main track of defendant, a "lead track" and five switch tracks. These switch tracks all connected with the "lead" between Livingston and Lundy streets. The first switch point cleaned was on the north line of Lundy street, the next one was eighty-five

feet north of that, and the next one ninety-one feet north of the second, which is the place they were working when plaintiff was injured. Defendant's tracks at the place mentioned ran directly north and south, and were within the corporate limits of the city of Streator. The streets mentioned ran east and west. Mumaw was a hostler or assistant engineer, whose duty it was to take charge of engines brought into the station with trains, and run them into the roundhouse, a considerable distance south of the place of the accident. The station or depot was some two and one-half blocks north of the place where the injury occurred. While plaintiff, Mull and Lantzer were cleaning the water out of the third switch point north of Lundy street, Mumaw came from the north with engine number nine for the purpose of taking it to the roundhouse. He was backing the engine down track number four which connected with the "lead" just south of Livingston street. The switch point at which plaintiff was working was on the "lead" track over which he would have to pass in taking his engine to the roundhouse. After backing down as far as Livingston street and before setting on the "lead," he observed a switch engine south of him which prevented his proceeding to the roundhouse and stopped his engine. No fireman was on the engine with Mumaw at the time, he being the sole person in charge of it. At the time of the accident and for some little while previous thereto, plaintiff was working with his face to the south, and Mull and Lantzer with their faces to the north in the direction of the engine. They were throwing water out of the ditches from the switch points with their shovels. Mumaw testified that when he stopped his engine at Livingston street on account of the switch engine being in the way, he got off and walked down to Lundy street to inquire how long the switch engine would hold the track, and on being informed that it would soon be out of the way, walked back to his engine. In going from his engine to Lundy street and returning he passed by the section men and saw them at work and what they were doing. He testified that on his

return to his engine, as he passed them he spoke to them
and said, "Boys, you better look out, I am coming back
down here." He says no one replied but that one of the
men "kind of straightened up." In this he was corrob-
orated by no one, but is positively contradicted by plaint-
iff and Lantzer, who swear they did not see him that
morning and did not hear him speak to any of the section
men. Shortly after returning to his engine, Mumaw re-
ceived a signal that the switch engine was out of his way
and started backing his engine south toward the round-
house and over the place where the section men were at
work, at a slow rate of speed. The section men continued
their work and did not observe the approach of the engine
until it was upon them. It struck Mull on the shoulder
but did not seriously injure him, while plaintiff was
knocked down, one leg cut off above the knee, and his
shoulder bone broken. He also claims he was otherwise
injured. Sawyer, the foreman, was not with his men at
this time, but was some 150 or 160 feet south of them. He
says he saw the engine standing still up near Livingston
street but did not see it afterwards until the accident hap-
pened. Plaintiff claimed no bell was rung and no whistle
sounded or any warning given of the approach of the en-
gine, and that it was neither seen nor heard by him until
he was struck by it. On this point there was a sharp con-
flict in the evidence. Plaintiff, Lantzer, Sawyer, Mull, Fer-
riter, and Rosamond White testified, some of them that no
bell was rung or whistle sounded, and others of them that
they heard no bell or whistle. Thomas Ferriter, who was
at that time in the employment of defendant at its depot
in Streator, testified his duties called him down the track
south that morning, and seeing the engine standing on the
track in charge of Mumaw, he asked permission to ride,
which was granted, and he got in on the fireman's seat.
He says the engine started immediately afterwards, and
that he did not hear the bell or whistle before the engine
started, and that no bell was rung or whistle sounded prior
to the accident that he knew or heard of. Foreman Saw-

yer, who was a little distance away from where his men were at work, testified that no bell was rung or whistle blown, and that the first thing that attracted his attention to the approach of the engine was the switchman Hamlin, calling out in an alarmed way, and that as he looked in the direction of his men, he saw plaintiff being rolled under the tank, and Mull "flustered pretty badly" and uncertain on his feet.   Rosamond White, who said she lived about 150 feet from the place of the accident, testified she was looking at the engine at the time and that no bell was rung or whistle sounded.   Plaintiff, Lantzer and Mull, all swear they heard no bell or whistle nor warning of any kind, and it is apparent they did not, for they remained on the track until struck by the engine, Lantzer and Mull facing the direction from which the engine was coming, and plaintiff with his back in that direction.

On the other hand, Mumaw, the hostler, Hamlin, at that time switchman, Pryor, an engineer of defendant, Hawkes, at that time engineer of defendant but not now in its employment, and Werts, who was not an employee of defendant, testify that the bell was rung, some of them that it was rung continuously from the time the engine was started until it struck plaintiff, and others that it was rung at the time the engine started south.   The proof showed it was the rule and custom to ring a bell while moving an engine as Mumaw was doing.   We have given the substance of enough of the testimony on this point, we think, to clearly show that whether or not any warning was given of the approach of the engine, if material at all, was necessarily a question to be determined by the jury.   It is claimed by defendant more witnesses testified for defendant positively that the bell was rung, than there were who testified for plaintiff positively that it was not.   While this is true, yet there were circumstances in connection with the testimony of some of the witnesses very proper to be considered by the jury in determining its weight and value.   Also, in addition to the testimony for plaintiff on this point, a question that seems to us worthy of consideration in determining

whether the bell was rung or not, is the fact that three men working together remained at their work, not knowing of the approach of the engine until it was upon them and two of them struck by it. The natural instinct for life and self-preservation would tend to cause men under such circumstances to take notice of the ringing of the bell as the engine approached them. B. & O. S. W. Ry. Co. v. Then, 159 Ill. 535; C., C., C. & St. L. Ry. Co. v. Keenan, 190 Ill. 217. But defendant insists that even if the bell was not rung, plaintiff cannot recover because he was guilty of contributory negligence in that the engine from the place where it last started, at or near Livingston street, was in his plain and unobstructed view if he had chosen to look in that direction; that he failed to take any such precaution, but continued working with his back in the direction of the engine, until it came upon him. We are of opinion that whether plaintiff was guilty of contributory negligence was under all the evidence a proper question to be submitted to the jury. While it is true he could have seen the engine by looking in the direction from which it came, we think he was entitled to rely upon the rule and custom prevailing in defendant's yards, that an engine should not be started without ringing a bell. Furthermore, he was within that distance of a public highway which required a bell to be rung or whistle sounded constantly as the engine approached the highway. On this point we said in our former opinion in this case, " The rule is well settled in Illinois, that a servant of a railroad company, though performing menial labor, like that of a section hand, whether in railroad yards, or on private right of way, is entitled to all the rights offered the public, either by ordinance, statute, or general custom of the company. I. C. R. R. Co. v. Gilbert, 157 Ill. 354; St. L. & T. H. R. R. Co. v. Eggmann, 161 Ill. 155; E. St. L. & C. R. R. Co. v. Eggmann, 170 Ill. 538."

It was further proven that it was the duty and custom of the foreman of the section gang to look out for his men and warn them of danger. At the time of plaintiff's injury the foreman was some eight or ten rods away, but whether

near enough to protect his men or not, was a question of fact.

It is also insisted plaintiff's injury was an assumed risk of his employment, because he testified that he had frequently seen Mumaw moving engines about without ringing a bell. He did not, however, testify that Mumaw was in the habit of starting engines from a stationary position without ringing a bell, nor that he was in the habit of moving them without ringing a bell or sounding a whistle in the yards when within the distance of a public highway where the statute required a bell to be rung or whistle sounded. Under the evidence we do not think the accident could be said as a matter of law to be the result of an assumed risk of plaintiff's employment.

It is strenuously insisted and ably argued that no recovery can be had in this case, because Mumaw, the hostler or assistant engineer, was a fellow-servant of the plaintiff. Being bound by our previous opinion in this case, from which we have no disposition to recede, that under the testimony this did not become a question of law to be determined by the court, but was a question of fact to be determined by the jury, we can only consider whether the evidence on that proposition so preponderated in favor of defendant as that the plaintiff ought not to have recovered and whether the court for that reason should have set aside the verdict and granted a new trial. The rule is, that what elements are required to constitute two men fellow-servants is a question of law, but whether or not in a given case they come within these requirements, is a question of fact. True, an exception is made to this rule by our Supreme Court, under the same circumstances in which it has been held that negligence becomes a question of law instead of a question of fact, but this is only "where there is no dispute whatever as to the facts, and they show beyond question that the relation of fellow-servants exists." C. & E. I. R. R. Co. v. Driscoll, 176 Ill. 330. In Meyer v. I. C. R. R. Co., 177 Ill. 591, it was said: "Where the evidence for the plaintiff is absolutely conclusive of the relation

existing between master and servant, and reasonable minds would not differ as to whether the relation of fellow-servants existed, in such case the question becomes one of law." The relations of the parties injured in those cases to the parties whose negligence is alleged to have caused the injury, were entirely different from those existing in this case. Plaintiff was a section hand, working on the tracks of defendant under one foreman, while the hostler was employed in another department and under another foreman, and there is nothing in the evidence to show that they ever came in contact with each other, or had anything to do with each other in their respective lines of employment, unless it be that they generally worked in the same territory. We are aware that whether two men are fellow-servants is not to be determined alone by their being or not being employed in the same department, but the rule as we understand it to have been laid down in the Moranda case, 93 Ill. 302, and a long line of decisions since then, is that "Servants of the same master, one of whom has caused an injury and the other of whom has received an injury, are fellow-servants, if at the time of the injury, they are directly cooperating with each other in the particular business in hand, or if they are brought by their usual duties into habitual consociation, so that they may exercise an influence upon each other promotive of proper caution." Wenona Coal Co. v. Holmquist, 152 Ill. 581; Whitner & Starrett Co. v. O'Rourke, 172 Ill. 177; C. & A. R. R. Co. v. O'Brien, 155 Ill. 630. Many other decisions of the Supreme and Appellate Courts are to the same effect. In L. E. & St. L. R. R. Co. v. Hawthorne, 147 Ill. 226, it was said: "Whether the relation of fellow-servants exists between employees of a common master, is a question of fact. It is not enough that they are servants of the same master, employed in the same enterprise. If they are not associated together in the performance of their duties, or their employment does not require cooperation or bring them together into such relations that they can exercise an influence upon each other promotive of proper caution, they

are not fellow-servants within the rule which exempts the master from liability for injury to one through the negligence of the other." In I. & St. L. R. R. Co. v. Morgenstern, 106 Ill. 216, the Supreme Court say : "The inquiry would arise whether they were in the service of a common master, were they engaged in the same line of employment, were the existing relations between them of such a character and their duties such as to bring them often together, cooperating in the particular work. These and perhaps other facts of a kindred character, were matters to be proven before the jury, and from the facts thus proven it was for the jury then to say whether the two servants, in the discharge of their duties, were fellows." In Rolling Mill Co. v. Johnston, 114 Ill. 57, Mr. Justice Schofield stated the rule to be "That the servants of the same master, to be coemployees so as to exempt the master from liability on account of injuries sustained by one resulting from the neligence of the other, shall be directly cooperating with each other in a particular business, *i. e.*, the same line of employment, or that their usual duties shall bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution."

No good purpose could be served by further extending this opinion with the citation of additional authorities in this state upon this question. An examination of the facts in numerous cases decided in this state, will show that employees of a common master have repeatedly been held not to be fellow-servants, where their relations brought them in quite as close association as those of plaintiff in this case and Mumaw, the hostler. In our opinion it cannot be said that the evidence was wholly insufficient to authorize a recovery by plaintiff on the ground that he and Mumaw were fellow-servants.

It is claimed the court erroneously permitted plaintiff to prove a custom as to ringing a bell subsequent to the accident, by the plaintiff and the witnesses Lantzer and Sawyer. When plaintiff was on the stand he was asked : " Was there any custom in regard to an engine on these

tracks when stationary and starting from a stationary position and running, in regard to ringing a bell or sounding a whistle?" This clearly referred to the time prior to the accident. The question was put to Lautzer in substantially the same way. After the witness Sawyer had described the accident and the situation just prior thereto, he was asked: "Is there any custom in the yards there where this accident happened, in regard to an engine ringing a bell when it is stationary and about to start up?" And he was permitted to answer the question over the defendant's objection. The objection to this question was general, stating no grounds. We think to have been availing, counsel should have stated the ground of the objection. We are also of opinion the witness understood and answered the question with reference to the custom prior to and at the time of the accident, and that the jury must so have understood it also.

Defendant asked the court to give to the jury thirty-four instructions. The court gave twenty-two of them and refused twelve, and plaintiff assigns for error the refusal to give instructions numbered 23, 24, 25, 26, 28, 30, 32, and 33. Great stress is laid on the court's ruling in refusing instruction number 23, which was intended to inform the jury as to the law of assumed risks. The instruction was slightly more elaborate in its statement of the law on this question than was the one given by the court. It is argued that the one given by the court on this question, was general in its statement, and the one refused was intended particularly to apply to the fourth and fifth counts of plaintiff's declaration. Inasmuch as the allegations in these counts and which it is claimed the refused instruction was particularly applicable to, were not proven by plaintiff, we are of opinion no error was committed in refusing the instruction. Number 17 given by the court clearly and correctly laid down the law upon this subject. It would unnecessarily occupy time and space to set out and discuss the other refused instructions, and the court's ruling in refusing them. Suffice it to say we have read carefully all the instructions given

and all those refused, and to our minds the jury were fully instructed as to the law of the case on behalf of defendant, and substantially all that was proper to be given, that was embraced in the refused instructions, will be found in those given by the court. Some of those refused, to our minds, do not state correct propositions of law as applicable to the facts in this case, while others invade the province of the jury, by telling it what the evidence proved, or by telling it that certain kinds of evidence were of more value and entitled to greater weight than other kinds.

It is further claimed that the remarks of one of plaintiff's counsel at the close of the evidence, were so improper and prejudicial as to authorize a reversal of this judgment. At the conclusion of the testimony, the court requested counsel to pass up their instructions before proceeding with the argument, to which Mr. Strawn, one of the plaintiff's counsel replied, " We have no instructions to pass up, Your Honor." The statement was objected to, because made in the presence of the jury, when Mr. Strawn replied, " We have a right to tell the jury that we are not going to ask any instructions." This statement was also objected to, and the objection was sustained. Plaintiff did not ask any instructions, and we are unable to see how the statement made by counsel could in any wise prejudice defendant.

It is further insisted that the verdict and judgment are excessive. The proof shows plaintiff was sixty years of age at the time of his injury, and was earning from one dollar and ten cents to one dollar and twenty-five cents per day, and it is argued that $8,000 is more money than he could have earned in the remainder of his lifetime if he had not been injured, and that the annual income from the amount of the judgment invested at five per cent would be greater than the amount of wages plaintiff was capable of earning. The proof is that the wheels of the tank passed over plaintiff's left leg above the knee and that it was amputated by defendant's surgeon, seven inches below the hip. His left shoulder bone was broken, weakening his arm and causing it to become smaller.

Plaintiff claimed he could not throw it behind him at all, and had to be careful of it. Such an injury in addition to its permanent effects was calculated to and did produce great pain and suffering. This latter element is not taken into consideration by defendant's counsel in the computation they have made to demonstrate that the verdict is excessive. It is true, for a man of plaintiff's years and earning capacity the verdict is somewhat large, but we do not regard it as so excessive as to call for any interference on our part.

The judgment is affirmed.

*Affirmed.*